The **TIMKEN COMPANY**, Plaintiff,

v.

**UNITED STATES**, Defendant,

and

**Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; NSK Ltd. and NSK Corporation, Defendant–Intervenors.**

Court No. 92–03–00163.
Slip Op. 94–157.

United States Court of
International Trade.

Oct. 7, 1994.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, John M. Breen, Amy S. Dwyer and Margaret E.O. Edozien, Washington, DC, for plaintiff, The Timken Co.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis, Asst. Director (Joan L. Mac-Kenzie, Attorney–Advisor, Office of the Chief Counsel for Import Administration, U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Susan P. Strommer and Niall P. Meagher, Washington, DC, for defendant-intervenors, Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.

Donohue and Donohue, Joseph F. Donohue, Jr. and Kathleen C. Inguaggiato, New York City, for defendant-intervenors, NSK Ltd. and NSK Corp.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Timken Company ("Timken"), challenges certain aspects of the Department of Commerce, International Trade Administration's ("Commerce") final results of administrative review of certain tapered roller bearings ("TRBs") from Japan. *Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Review* ("*Final Results*"), 57 Fed.Reg. 4,975 (Feb. 11, 1992).

### Background

In 1987, Commerce published an antidumping duty order on TRBs from Japan. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan,* 52 Fed.Reg. 37,352 (Oct. 6, 1987).

In May of 1991, Commerce published the preliminary results of the 1989–90 administrative review. *Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Pre-liminary Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 23,278 (May 21, 1991).

In February of 1992, Commerce published the final results which are at issue herein covering the period August 1, 1989 through July 31, 1990, *Final Results,* 57 Fed.Reg. at 4,975, as amended by *Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Amended Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 9,105 (March 16, 1992).

Timken moves pursuant to Rule 56.2 of the Rules of this Court, alleging the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) circumstance of sale ("COS") adjustment to foreign market value ("FMV") to offset the effect of forgiven Japanese value added tax ("VAT"); (2) use of the highest weighted average margin as best information available ("BIA"); (3) adjustment of foreign market value for presale inland freight; (4) use of the Japanese short-term interest rate in calculating imputed interest expenses; (5) treatment of subject merchandise admitted into foreign trade zones ("FTZs"); (6) failure to collect interest for underpayment of antidumping duties; and (7) clerical errors.

### Discussion

The Court's jurisdiction over this matter is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

■ A final determination by Commerce in an administrative proceeding will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

### 1. COS Adjustment to FMV for Forgiven VAT

■ Timken alleges Commerce erred in making a circumstance of sale adjustment to foreign market value for the Japanese value added tax forgiven on exports. Timken states Commerce acted contrary to 19 U.S.C. § 1677a(d)(1)(C) (1988) which requires an upward adjustment to United States price ("USP") for VAT not collected on exports to the United States, to make USP comparable to home market prices that already include the fully-assessed VAT. In accordance with this provision, decisions of this Court and *Zenith Elec. Corp. v. United States,* 988 F.2d 1573 (Fed.Cir.1993), Timken urges this Court instruct Commerce to recalculate the margin with an adjustment only to USP and without a COS adjustment to FMV. *Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record ("Timken's Brief")* at 13–16.

Defendant agrees with Timken and requests that this issue be remanded for a recalculation of the dumping margins without a COS adjustment. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Brief")* at 6–7.

■ In *Zenith,* the Federal Circuit held that Commerce may not make a COS adjustment to FMV to account for home market VAT. *Zenith,* 988 F.2d at 1580–82. The Court noted that adjusting USP alone distorted the dumping margin, as a result of a "multiplier effect" inherent in the way taxes are assessed. *Id.* at 1578. The Court, however, concluded that this distortion is inevitable and was clearly contemplated by Congress. *Id.* at 1580–82. The Court held the exporters responsible for the multiplier effect and did not require any accounting or compensating for the effect. *Id.* In what is clearly dicta, the Court did, however, contemplate that Commerce could eliminate the multiplier effect by adjusting USP by amount, rather than by rate, of *ad valorem* tax. *Id.* at 1582. The dicta appear in footnote 4:

> [19 U.S.C. § 1677a(d)(1)(C) ] by its express terms allows adjustment of USP in the *amount* of taxes on the merchandise sold in the country of exportation. While perhaps cumbersome, Commerce may eliminate the multiplier effect by adjusting USP by the amount, instead of the rate, of the *ad valorem* tax.

> *Id.*

On the basis of that language, defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo") suggest this Court require Commerce adjust USP in this case by the amount, and not the rate, of the forgiven VAT. *Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Koyo's Brief")* at 3–8. Timken disagrees, arguing Commerce must not adhere to the methodology suggested in the *Zenith* footnote as it is contrary to the substantive holding of the case. *Reply Memorandum of the Timken Company in Support of Motion for Judgment on the Agency Record ("Timken's Reply")* at 1–14.

This Court has already decided this issue and has found that footnote 4 is clearly at odds with the body of *Zenith* and the language of the statute. *Federal–Mogul Corp. v. United States,* 17 CIT ——, —— - ——, 834 F.Supp. 1391, 1396–97 (1993). This Court declines to depart from its previous interpretation of *Zenith,* which is to require Commerce adjust USP by the rate of VAT forgiven in the foreign market, and *not* by the amount of forgiven VAT. *Id.*

Therefore, this issue is remanded so that Commerce may apply the rate of Japanese VAT forgiven to USP, calculated at the same point in the stream of commerce where the Japanese VAT is applied for home market sales, and add the resulting amount to USP, without a COS adjustment to FMV.

### 2. Use of the Highest Weighted Average Margin as BIA

■ Commerce requested the respondents to report home market sales of the first four TRB models selected as "such or similar" according to Commerce's five-criterion model match methodology. Koyo and defendant-intervenors NSK Ltd. and NSK Corporation ("NSK") did not comply completely with Commerce's request and Commerce conse-

quently resorted to BIA in those instances. Commerce selected the highest weighted average margin for the period of review, the 16.35% margin calculated for Koyo, as BIA. *Final Results,* 57 Fed.Reg. at 4,978.

Timken alleges that Commerce's application of Koyo's weighted average margin as best information available when home market sales information was not supplied was an abuse of discretion and contrary to law. Stating that the BIA rule is one of adverse inference and that it is not within Commerce's discretion to select neutral or favorable information for a non-cooperative party, Timken asserts Commerce should have selected as BIA the highest rates calculated for Koyo and NSK for any previous review. *Timken's Brief* at 17–26.

Commerce responds that it properly exercised its broad discretion in selecting BIA. Commerce states it has complied with its two-tier BIA methodology in that it has selected the highest published rate found in the review for the same class or kind of merchandise from the same country of origin. *Defendant's Brief* at 7–9.

Koyo asserts Commerce's use of BIA where Koyo's model match methodology did not conform to Commerce's methodology should be upheld because of Commerce's broad discretion to select BIA and its reasonable exercise of that discretion in this instance. In addition, Koyo argues that it could not be characterized as a non-cooperative party simply because its approach to the complicated task of matching U.S. and home market sales did not comply exactly with that of Commerce. *Koyo's Brief* at 8–10.

With respect to its model match methodology for its merchandise, NSK reiterates the arguments made by Commerce and Koyo. *Memorandum of NSK Ltd. and NSK Corporation in Opposition to Motion of The Timken Company for Judgment Upon the Agency Record ("NSK's Brief")* at 14–18.

■ This Court finds that the antidumping statute is silent as to what constitutes best information available. 19 U.S.C. § 1677e (1988). Because Congress explicitly left a gap for the agency to fill, it is within Commerce's discretion to decide what constitutes

best information available in a particular case and this Court must grant that decision considerable deference. *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1191–92 (Fed.Cir.1993). It is therefore within Commerce's discretion not to choose BIA most adverse to non-cooperating parties. *Saha Thai Steel Pipe Co. v. United States,* 17 CIT ——, ——, 828 F.Supp. 57, 62–64 (1993).

This Court finds that Commerce exercised its discretion in this matter reasonably and in accordance with law. Commerce explained its choice of BIA:

> Where the Department's model match resulted in a different choice than Koyo's [or NSK's] model match, and where home market sales information was not submitted for that particular model, we have applied the highest weighted average margin for the period of review as BIA when that model is chosen as the such or similar home market model.

*Final Results,* 57 Fed.Reg. at 4,978.

Therefore, this Court finds that Commerce's choice of BIA in this case is supported by substantial evidence and in accordance with law and is hereby affirmed.

### 3. Pre-sale Inland Freight Adjustment to FMV

■ Commerce adjusted FMV for home market pre-sale movement expenses incurred during the transport of merchandise from the factory to the warehouse or distribution center. Timken argues that treating home market pre-sale inland freight expenses as direct selling expenses is contrary to law. For support, Timken relies on 19 U.S.C. § 1677b(a)(4) (1980), its legislative history and case law which suggest that adjustments to FMV should be limited to selling expenses directly related to the sales under consideration. Timken argues that, as pre-sale freight expenses may not relate to a home market transaction, they should not be deducted as direct selling expenses, and Commerce's act in so doing was *ultra vires.* *Timken's Brief* at 27–33.

Commerce acknowledges that 19 U.S.C. § 1677a(d)(2)(A) requires that it reduce USP by any expenses "incident to bringing the

merchandise from the place of shipment in the country of exportation to the place of delivery in the United States." 19 U.S.C. § 1677a(d)(2)(A). Commerce regulations, contained in 19 C.F.R. § 353.41(d)(2)(i) (1992), similarly provide for an adjustment to USP for all movement expenses incurred on United States sales, regardless of when they are incurred. Thus, Commerce argues, the current antidumping duty law requires Commerce to deduct all movement expenses incurred, even those incurred prior to sale, on United States sales in order to establish the ex-factory price for sales comparison purposes. Pursuant to these provisions, Commerce must deduct all inland freight expenses incurred on U.S. sales in order to establish the ex-factory price for comparison to FMV. However, no corresponding provision exists with regard to inland freight expenses incurred in the home market. *Defendant's Brief* at 9–15.

Nonetheless, Commerce argues that by denying an adjustment for pre-sale inland freight expenses to FMV, Commerce essentially would compare an ex-factory price in the United States to an ex-warehouse price in the home market. By deducting pre-sale inland freight expenses from FMV in the home market, Commerce is able to compare U.S. ex-factory prices with their counterpart in the home market. *Id.*

Koyo and NSK agree with Commerce and urge this Court to affirm Commerce on this issue. *Koyo's Brief* at 11–13; *NSK's Brief* at 18–24.

■ It is well-established that when Congress has included specific language in one section of a statute but has omitted it from another related section of the same act, it is generally presumed that Congress intended the omission. *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983). In the case at issue, therefore, Congress evidently intended the omission of a provision requiring an adjustment for inland freight expenses incurred in the home market.

The Court of Appeals for the Federal Circuit, in *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. Unit-*ed States, 13 F.3d 398, 401–02 (Fed.Cir.1994), *petition for cert. filed* (May 27, 1994), stated:

... we believe that had Congress intended to deduct home-market transportation costs from FMV, it would have made that intent clear. FMV and USP are intimately related concepts, given full meaning only by their relationship to one another. The Antidumping Act revolves around the difference between the two. *See* 19 C.F.R. § 353.2(f)(1) (1993) (defining dumping margin with reference to USP and FMV). In slightly different forms, the USP provision, 19 U.S.C. § 1677a, and the FMV provision, 19 U.S.C. § 1677b, were passed together as part of the original Antidumping Act, 1921, ch. 14, 42 Stat. 11 (1921). From the Act's beginning, therefore, it is likely Congress has considered one only with reference to the other and has been well aware of any differences between them. That Congress included a deduction for transportation costs from USP but not from FMV leads us to conclude that Congress did not intend pre-sale home-market transportation costs to be deducted from FMV.

The *Ad Hoc Comm.* court, however, limited its decision to the calculation of FMV in purchase price situations only. *Id.* at 400. As it is not clear to this Court whether FMV was calculated in this case using purchase price or ESP, this Court remands this issue to Commerce to deny the adjustment to FMV for pre-sale home market transportation expenses only if FMV was calculated using purchase price.

### 4. Inventory Carrying Cost

■ In the preliminary results, Commerce calculated inventory carrying cost based on U.S. interest rates, but in the final results, Commerce recalculated the U.S. inventory carrying cost of NSK's U.S. subsidiary, NSK Corporation ("NSKC"), using NSK's short-term interest rate in Japan. *Final Results,* 57 Fed.Reg. at 4,984.

NSK objected to Commerce's use of the U.S. short-term credit rate in the calculation of inventory carrying cost in the preliminary results. Because NSKC had six months to pay for the imported merchandise, NSK argued that, as the parent company, it incurred

the cost of keeping the goods in inventory for the subsidiary. NSK contended that because the time value of its funds was being measured, and because NSK would borrow at the lower rate in Japan according to reasonable commercial practice, Commerce should use the home market interest rate to impute the U.S. inventory carrying cost. Commerce agreed with NSK's position, stating:

> Normally, the Department calculates U.S. inventory carrying cost using the U.S. interest rate because the U.S. subsidiary bears the full cost of carrying the merchandise. However, as per *High Information Content Flat Panel Displays and Display Glass Thereof From Japan* (July 16, 1991, 56 FR 32399), if the payment terms that the parent extends to its subsidiary, in combination with the time the merchandise remains in the subsidiary's inventory, indicates that the parent bears the cost of carrying the merchandise for a portion of time the merchandise is in inventory, then the parent's short-term interest rate will be used to calculate that portion of the inventory carrying cost. Accordingly, we have recalculated NSKC's U.S. inventory carrying cost using NSK's short-term interest rate for the time that NSK bears the cost of carrying the inventory.

*Final Results,* 57 Fed.Reg. at 4,984.

Timken claims that Commerce has not "articulated any reasoned basis for departing from its established precedent" because the published determinations do not reveal, for example, whether the U.S. importers in question had access to foreign currency loans. *Timken's Brief* at 38–39.

Timken maintains that given the facts of this case, Commerce should use the U.S. borrowing rate to measure the cost of storing merchandise in the United States by reference to the opportunity cost faced by the exporter, NSKC. Commerce's use of the Japanese short-term rate for the portion of time the cost was allegedly borne by NSK is contrary to the purpose of imputing a credit expense, and is contrary to long-standing agency practice. Absent a reasonable basis for departing from that practice which has been affirmed by this Court, Timken argues, Commerce's determination here should be

reversed and remanded. *Timken's Brief* at 34–40.

Commerce disputes Timken's arguments and adheres to its rationale set out in the final results. Commerce points out that in this case, the Japanese parent shipped the merchandise to its U.S. subsidiary and permitted it to pay at a later time. Therefore, Commerce had to determine the value of the delayed payment, which was the lost opportunity cost to the *parent.* Commerce argues it was therefore reasonable to calculate the imputed interest expense using the cost of borrowing in Japan. *Defendant's Brief* at 15–20.

NSK states that all the time its goods were in inventory, NSKC had no inventory carrying cost because it had not paid for the goods. On the other hand, NSK, the parent company, bore the cost of maintaining the inventory in the United States. Commerce, therefore, properly calculated the cost using the credit rate in Japan. *NSK's Brief* at 24–28.

■ Pursuant to 19 U.S.C. § 1677a(e)(2) (1988), Commerce must make a reduction to ESP in the amount of any "expenses generally incurred by or for the account of the exporter." Contrary to Timken's assertion, the site or location at which the selling expenses are incurred is not determinative for making these adjustments under 19 U.S.C. § 1677a(e)(2). *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 270, 712 F.Supp. 931, 948 (1989), *aff'd in part and rev'd in part,* 6 F.3d 1511 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994).

Commerce having found that the Japanese parent company, NSK Ltd., bore the cost of maintaining the inventory in the United States, there is no reason why the U.S. subsidiary could not have benefitted from its parent's ability to borrow money in the home market at the home market interest rate. *LMI–La Metalli Industriale, S.p.A. v. U.S.,* 912 F.2d 455, 460–61 (Fed.Cir.1990). Having explained its actions, the Court finds that Commerce's adjustment of FMV for inventory carrying costs was reasonable and in accordance with law and is sustained.

### 5. Treatment of Subject Merchandise Admitted to FTZs

 Although Timken concedes that Commerce is not required to collect antidumping duty deposits for TRBs subject to an antidumping duty order admitted into a FTZ, Timken contests Commerce's failure to obtain information on such merchandise. Timken asserts Commerce's failure to document the volume and value of all entries and to verify with the Customs Service their liquidation status ("privileged" or "non-privileged") was an abuse of discretion and contrary to law. Timken seems to suggest that a failure to gather information upon the entry of TRBs into FTZs will result in a failure to collect antidumping duty deposits when the TRBs leave FTZs and enter the customs territory of the U.S. *Timken's Brief* at 40–43.

Commerce disputes Timken's assertions. Commerce points out it does not know of any and Timken did not reference a statute or regulation which require Commerce to collect information on subject TRBs entered into FTZs. Since Congress did not intend that duties be assessed or estimated duties be collected upon such merchandise, Commerce asserts it was not required to collect information. Commerce states that when the TRBs are entered into the customs territory of the U.S., that will be the time to include TRBs in an administrative review and to collect information regarding them. *Defendant's Brief* at 20–22.

NSK agrees with Commerce that since antidumping duties were not assessable, Commerce was not required to monitor the entries. Further, NSK states that it did not import any in-scope merchandise into a FTZ and, therefore, there was no relevant information to collect with respect to NSK FTZ merchandise. *NSK's Brief* at 28.

The Court finds Timken's position to be without merit. Commerce is quite right that there is no requirement that the volume, value, liquidation status or other information regarding merchandise subject to an antidumping duty order be collected upon its entry into a FTZ. 15 C.F.R. § 400.33(b)(1) (1992) mandates that FTZs "shall not be used to circumvent antidumping and counter-

vailing duty actions." It is well-established that it is upon the entry of subject merchandise into the customs territory of the U.S. that the merchandise is subject to the customs laws. *Torrington Co. v. United States,* 17 CIT ——, ——, 826 F.Supp. 492, 494 (1993). Thus, Commerce is required to include the merchandise in an administrative review and collect information only upon the entry of the merchandise into the customs territory of the U.S. Accordingly, the Court finds Commerce's action to be reasonable and in accordance with law and is hereby sustained.

### 6. Interest on Underdeposit of Antidumping Duties

 Commerce did not hold Koyo and NSK liable for interest on underdeposits of antidumping duties assessed on entries of TRBs when they had not been ordered to make cash deposits and had instead posted bonds. *Final Results,* 57 Fed.Reg. at 4,975–76.

Timken alleges that pursuant to 19 U.S.C. § 1677g (1988), Koyo and NSK are liable for interest on underpayments of amounts deposited to secure antidumping duties, regardless of whether the security was made in the form of bonds or cash. Timken respectfully asserts the Court's previous findings to the contrary contradict the construction of the statute and congressional intent. *Timken's Brief* at 44–51.

Commerce and defendant-intervenors argue that defendant-intervenors are not liable for interest on underdeposits of antidumping duties because payment of interest is tied to deposits and Koyo and NSK were not required to make estimated duty deposits upon their entries. *Defendant's Brief* at 22–30; *Koyo's Brief* at 13–16; *NSK's Brief* at 28–30.

Commerce explained its decision, stating:

... the only statutory authorization for assessing or paying interest on underpayments or overpayments of amounts deposited for antidumping duties in section 737(b), which provides that if the amount of an estimated antidumping duty deposited under section 736(a)(3) is different from the amount of the antidumping duty deter-

mined under an antidumping duty order issued under section 736, then the difference shall be (1) collected, to the extent that the deposit under section 736(a)(3) is lower than the duty determined under the order, or (2) refunded, the extent that the deposit under section 736(a)(3) is higher than the duty determined under the order, together with interest as provided by section 778. The amount of estimated antidumping duty deposited referred to in section 736(a)(3) is only a cash deposit, not a bond. See also, 19 CFR 353.24. Cash deposits were first required on entries of this merchandise manufactured by Koyo and NSK on June 1, 1990. Consequently, interest will only be collected or refunded on under- or overpayments of cash deposits on entries after that date. The Department's interpretation has been upheld by the CIT (*Timken v. United States*, 15 C.I.T. 526, 777 F.Supp. 20 (1991)).

*Final Results*, 57 Fed.Reg. at 4,975–76.

This issue has already been ruled upon by the Court in *Timken Co. v. United States*, 16 CIT 999, 1001, 809 F.Supp. 121, 122–23 (1992) ("[19 U.S.C. § 1677g] is clear on its face that interest is collectable only on deposits and not on bonds"); *see also Timken Co. v. United States*, 15 CIT 526, 535, 777 F.Supp. 20, 27 (1991). The Court adheres to its decision in those cases. Further, the Federal Circuit has recently affirmed the holding in *Timken* 16 CIT 999, 809 F.Supp. 121. *Timken Co. v. United States*, 37 F.3d 1470, 1476 (Fed.Cir.1994) ("Section 1677g(a)'s 'amounts deposited' language does not encompass bonds. ITA and the trial court interpreted the above statutory scheme correctly by restricting the term 'amounts deposited' in section 1677g(a) to cash deposits.").

Therefore, without a duty order, Koyo and NSK did not have an obligation to make a cash deposit and consequently, had no obligation to pay interest. Commerce's interpretation of the statutory scheme and decision not to impose interest in this case are hereby sustained.

### 7. *Clerical Errors*

Timken alleges Commerce committed two clerical errors which should be remanded for correction. *Timken's Brief* at 52–53. Commerce and Koyo agree that correction of these errors is in order. *Defendant's Brief* at 6; *Koyo's Brief* at 3.

■ Koyo alleges Commerce committed two additional clerical errors. First, Koyo alleges Commerce failed to restrict product matches to the same bearing part type, in matching only those products which had the same part type and the same number of rows sequentially, rather than in conjunction with one another. Second, Koyo alleges Commerce failed to treat identical matches ahead of similar matches. Koyo disputes the short order used by Commerce because it places the sum of the deviations ahead of identicalness or similarity. *Koyo's Brief* at 16–18. Timken responds that Koyo should not be permitted to raise additional claims in the context of Timken's civil action and should address them in the remand proceeding or in its own civil action. *Timken's Reply* at 28.

The Court finds Timken's contention that Koyo is precluded from bringing a clerical error to the attention of the Court to be without merit. This Court is "loathe to affirm a determination that might be based on a questionable record." *Serampore Indus. Pvt. Ltd. v. United States Dep't of Commerce*, 12 CIT 825, 834, 696 F.Supp. 665, 673 (1988). Therefore, Commerce is instructed to consider whether any clerical errors were committed, including in its consideration those alleged by Koyo, and correct any errors it finds.

### *Conclusion*

In accordance with the foregoing opinion, this case is remanded to Commerce for: (1) application of the rate of Japanese VAT forgiven to USP, calculated at the same point in the stream of commerce where the Japanese VAT is applied for home market sales, and addition of the resulting amount to USP, without a COS adjustment to FMV; (2) denial of the adjustment to FMV for home market pre-sale freight expenses where FMV was calculated using purchase price; and (3)

correction of any clerical errors. Commerce's determination is affirmed in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.