**HELMERICH & PAYNE, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**U.S. Steel Group, A Unit of USX Corp., Defendant–Intervenor.**

Slip Op. 98–134.
Court No. 97–10–01732.

United States Court of International Trade.

Sept. 17, 1998.

Barnes, Richardson & Colburn (Brian F. Walsh), for Plaintiff.

Frank W. Hunger, Assistant Attorney General of the United States, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Randi Rimerman Serota, Attorney; of counsel, Myles S. Getlan, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC, for Defendant.

Skadden, Arps, Slate Meagher & Flom LLP (Robert E. Lighthizer and John J. Mangan), Washington, DC, for Defendant–Intervenor.

## OPINION

POGUE, Judge.

This matter is before the Court on the motion of Plaintiff, Helmerich & Payne ("Plaintiff"), for judgment upon the agency record pursuant to USCIT R. 56.2. Plaintiff challenges certain aspects of the U.S. Department of Commerce's ("Commerce" or the "Department") final results of the administrative review in *Oil Country Tubular Goods From Japan*, 62 Fed.Reg. 48,594 (Dep't Commerce 1997) (final results admin. review) ("Final Results"). Defendant–Intervenor, U.S. Steel Group, A Unit of USX Corp. ("U.S. Steel"), opposes Plaintiff's motion for judgment upon the agency record.

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994) and 19 U.S.C. § 1516a(b)(1)(B)(1994).

## Background

NKK Corporation ("NKK"), an unaffiliated Japanese manufacturer, sold certain oil country tubular goods ("OCTG") to Mitsubishi Corporation, a Japanese trading company.

P.R. Doc. No. 26, at 1. Mitsubishi Corporation sold the subject merchandise to MC Tubular Products, Inc., which, in turn, sold the merchandise to Plaintiff. *Id.* Plaintiff entered the subject merchandise into a foreign trade zone ("FTZ"). *Id.* Subsequently, on February 2, 1995, Commerce made a preliminary determination that OCTG from Japan were being, or likely to be, sold in the United States at less than fair value. *Oil Country Tubular Goods From Japan*, 60 Fed.Reg. 6,506 (Dep't Commerce 1995)(prelim.det.). On August 11, 1995, after all the sales occurred, Commerce published an antidumping duty order on OCTG from Japan.[1] *Oil Country Tubular Goods From Japan*, 60 Fed.Reg. 41,058 (Dep't Commerce 1995) (antidumping duty order) ("Order"). Following the issuance of the Order, Plaintiff withdrew the subject merchandise from the foreign trade zone and entered it into the United States. P.R. Doc. No. 51, at 1–2. Pursuant to the Order, Customs required Plaintiff to deposit antidumping duties on the merchandise upon entry.

On August 12, 1996, Commerce published a notice of "Opportunity to Request an Administrative Review" of the Order for the 1995–96 review period. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*, 61 Fed.Reg. 41,-768, (Dep't Commerce 1996) (opp. request admin. review). The notice indicated that if the Department did not receive "a request for a review of entries covered by [the] order," Commerce would instruct the Customs Service to assess duties on those entries "at a rate equal to the cash deposit of ... estimated antidumping ... duties required on those entries at the time of entry...." *Id.* at 41,771.

Plaintiff requested that Commerce conduct an administrative review of "sales of merchandise imported by or withdrawn from a foreign trade zone by Helmerich & Payne during the reference period [August 11, 1995 through July 31, 1996] produced by NKK

---

**1.** Plaintiff claims that all but one of the subject sales occurred prior to the preliminary determination. Plaintiff bases this conclusion on the date of the invoice between NKK to Mitsubishi Corporation, or alternatively the date of the purchase agreement between Helmerich & Payne and MC Tubular Products.
*See* Pl.'s Reply Mem. Supp. Mot. J. Agency R. at 7 ("Pl.'s Reply Brief"); *see also* P.R. Doc. No. 28, at 2–3.

Corporation of Japan." P.R. Doc. No. 2. On September 4, 1996, Plaintiff confirmed that the company understood "a full review of sales made during the relevant period by NKK" would result from Plaintiff's request for an administrative review. P.R. Doc. No. 4.

On September 19, 1996, Commerce sent an antidumping questionnaire to NKK stating the Department was "examining sales, entries or shipments, as specified in the enclosed questionnaire, during the period August 1, 1995, through July 31, 1996." P.R. Doc. No. 8, at 1. Commerce requested that the company submit information allowing the Department to determine whether the subject merchandise is being, or likely to be, sold in the United States at less than its fair value. Specifically, the questionnaire instructed NKK to "[r]eport each U.S. sale of merchandise entered for consumption during the [period of review], except: (1) for EP sales, if you do not know the entry dates, report each transaction involving merchandise shipped during the [review period]...."[2] *Id.* at 58. Commerce warned NKK that if the company did not submit the relevant information, the Department may resort to facts available. *Id.* at 1.

NKK responded to the questionnaire with a letter stating that the company did not sell or ship merchandise to the United States during the period of review ("POR"). P.R. Doc. No. 26, at 1. NKK attached documents demonstrating that the company's sales of the subject merchandise to Mitsubishi Corporation occurred prior to the issuance of the Order. *Id.* at 2. The letter indicated, however, that NKK was aware of the fact that Helmerich & Payne had entered OCTG manufactured by NKK during the POR. *Id.* at 1.

On November 4, 1996, Plaintiff submitted documentation demonstrating that each entry of its merchandise could be traced to the NKK sales. P.R. Doc. No. 28, at 2. Plaintiff offered two alternative dates as the "date of sale": the date of NKK's invoice to Mitsubishi Corporation or the date of the purchase agreement between Helmerich & Payne and MC Tubular. *Id.* at 2–3. Both of these dates occurred prior to the date of the Order. *Id.* at 3. Plaintiff maintained that because the date of sale on the subject merchandise took place prior to the effective date of the Order, the merchandise was not subject to the assessment of antidumping duties. *Id.*

On December 5, 1996, Commerce sent a letter to NKK stating that the company's letter "did not respond to most of the Department's questionnaire." P.R. Doc. No. 39. The Department noted that "entries of subject merchandise produced by NKK are subject to the first administrative review of this order." *Id.* Commerce requested that NKK "respond in full" by December 19, 1996 or the Department would use facts available. *Id.*

On December 16, 1996, Plaintiff reiterated its position that the date of sale was the only determination that Commerce needed to make as the subject sales occurred prior to the effective date of the Order. P.R. Doc. No. 40. Plaintiff maintained that NKK's response of October 30, 1996 and its submission of November 4, 1996 "provide sufficient information to establish the date of sale for the subject merchandise as prior to the effective date of the order." *Id.*

On May 12, 1997, Commerce issued its preliminary results for the first administrative review of the present proceeding. *Oil Country Tubular Goods From Japan,* 62 Fed.Reg. 25,889 (Dep't Commerce 1997)(notice partial rescission antidumping duty admin. review and prelim. results antidumping admin. review). Commerce applied facts available because NKK did not submit a complete response to the Department's questionnaire. Commerce explained, "[i]nformation on the record ... indicates that there were entries during the POR of subject mer-

---

2. Prior to the Uruguay Round Agreements Act, export price ("EP") sales were designated purchase price sales, while constructed export price ("CEP") sales were designated exporter's sales price sales. "Notwithstanding the change in terminology, no change [was] intended in the circumstances under which export price versus constructed export price are to be used." H.R.Rep. No. 103–826(I) at 79 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 3851. In a CEP situation, the sale may take place before or after entry. 19 U.S.C. § 1677a(b)(1994). In an EP situation, the sale must occur before the entry. 19 U.S.C. § 1677a(a)(1994).

chandise produced by NKK . . . [T]hese entries are subject to review, regardless of NKK's assertions regarding sale and shipment dates." *Id.* at 25,890. Commerce found a 44.20 percent margin for NKK.[3]

On September 16, 1997, Commerce reiterated its preliminary finding in the Final Results. 62 Fed.Reg. at 48,594.

## Discussion

### I. Use of Facts Available

The antidumping duty statute mandates that Commerce use facts otherwise available where, among other reasons, an interested party "withholds information that has been requested by [Commerce]." 19 U.S.C. 1677e(a)(2)(A)(1994). Once Commerce has determined to use facts available, section 1677e(b) permits an adverse inference if the Department can find that the "party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). Such an adverse inference may permit reliance on information derived from the petition, the final determination, a previous review, or any other information placed on the record. *Id.*

■ The relevant case law requires that Commerce must "fairly request" the data prior to resorting to any secondary information.[4] *See Koyo Seiko Co. v. United States,* 92 F.3d 1162, 1165 (Fed.Cir.1996). Once Commerce has done so, it possesses the "discretion to determine whether a respondent has complied with an information request." *Daido Corp. v. United States,* 19 CIT 853, 861, 893 F.Supp. 43, 49–50 (1995) (citing S.Rep. No. 249, 96th Cong., 1st Sess. at 98 (1979); H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979)).

■ In the questionnaire sent to NKK on September 19, 1996, Commerce requested that the company submit information allowing the Department to determine whether the subject merchandise is being, or likely to be, sold in the United States at less than its fair value. Commerce requested that NKK respond to

sections A (General Information), B (Sales in the Home Market or to a Third Country), and C (Sales to the United States). If after examining sections A and C of the questionnaire you conclude that your company and its affiliates did not have any U.S. sales or shipments during the [POR], please submit a statement to that effect, following the data submission requirements specified in the general instructions.

P.R. Doc. No. 8, at 1. Commerce warned NKK that if the company did not submit the relevant information the Department "may proceed on the basis of facts available." *Id.* Furthermore, on December 5, 1996, Commerce sent a second request for information to NKK, indicating that the documents submitted by the company regarding sales entered during the POR were insufficient. The letter explained:

Based on information on the record of this review, it appears that entries of the subject merchandise produced by NKK are subject to the first administrative review of this order. Consequently, NKK should respond in full to the Department's September 19, 1996, questionnaire. Failure to submit such a response by COB December 19, 1996, may result in the Department's use of facts available.

P.R. Doc. No. 39, at 1.

■ Commerce's original questionnaire clearly requested that NKK submit information regarding the company's sales of the subject merchandise in order for the Department to determine whether the OCTG were sold in the United States at prices below

---

**3.** Commerce assigned NKK an antidumping margin of 44.20 percent, which constitutes the highest rate for any company for the same class or kind of merchandise from the same country from this or any prior segment of the proceeding. *Final Results,* 62 Fed.Reg. at 48,596.

**4.** The Court notes that the cases cited refer to the best information available ("BIA") terminology

under the pre-Uruguay Round version of the antidumping statute. However, the BIA standard cited applies in this case. *See* H.R. Doc. No. 103–316 at 869 (1994) ("SAA")(stating that if an interested party does not provide necessary information the Department shall make the determination on the basis of the "facts available").

normal value.[5] Commerce's second letter on December 5, 1996 reiterated this request. NKK nonetheless failed to provide the Department with the sales information regarding the OCTG subject to the Order. Therefore, the Department appropriately resorted to the use of facts available, pursuant to section 1677e(a)(2)(A). *See* 19 U.S.C. § 1677e(a)(2)(A). Furthermore, Commerce had the discretion to rely on adverse facts available from the original petition because NKK did not cooperate by failing twice to complete the questionnaire. *Final Results*, 62 Fed.Reg. at 25,890.[6]

## II. Antidumping Statute

■ Plaintiff argues that Commerce unlawfully included in its administrative review sales of OCTG made prior to the issuance of the Order. Pl.'s Mem Sup. Mot. J. Agency R. at 6–7 ("Pl.'s Brief"). Plaintiff maintains that Commerce cannot use sales of OCTG that occurred prior to the POR to calculate the dumping margin. *Id.* Further, Plaintiff argues that because Commerce cannot use sales outside the review period to calculate a dumping margin, the Department cannot assess duties on the entries linked to those sales. *Id.* Plaintiff claims that Commerce's approach in this case is inconsistent with the antidumping statute, court precedent, and past administrative practice. *Id.* at 12.

Plaintiff argues that the antidumping statute's "focus ... on sales," prevents Commerce from using sales outside the POR in the calculation of an antidumping margin. *Id.* at 15. In support of this argument, Plaintiff cites section 1673 which states that antidumping duties are imposed when "foreign merchandise is being, or is likely to be, *sold in the United States* at less than its fair value...." *Id.* (citing 19 U.S.C. § 1673(1)(1994)) (emphasis in original). Plaintiff emphasizes that the statute requires Commerce to examine the "price at which the subject merchandise is first sold" in order to determine the antidumping duty for entries made during the period of review. Pl.'s Brief at 15 (citing 19 U.S.C. § 1677a).

Commerce responds that the antidumping statute is silent with respect to how dumping margins are to be calculated. Def.'s Mem. Opp'n Pl.'s Mot. J. Agency R. at 11 ("Def.'s Brief"). Commerce maintains, however, that the statute requires the Department to calculate and assess antidumping duties on all entries of subject merchandise covered by a particular review period. *Id.* at 16. Commerce points to the language in the statute providing that in an administrative review the Department "shall determine—(i) the normal value and export price (or constructed export price) of *each entry* of the subject merchandise, and (ii) the dumping margin for *each such entry.*" *Id.* at 15 (citing 19 U.S.C. § 1675(a)(2)(A)) (emphasis in original). Commerce further stresses that section 1675(a)(2)(C) mandates the dumping margin determination "shall be the basis for the assessment of ... antidumping duties on *en-*

---

**5.** Specifically, section B requested information about the home market, or where appropriate, a third-country market, including a sales list and other information necessary for Commerce to calculate the normal value of the merchandise. P.R. Doc. No. 8, at 27.

**6.** The Court recognizes that Commerce resorted to adverse facts available based on the actions of the original manufacturer, not Plaintiff, the importer of record. Nevertheless, court precedent under the BIA standard illustrates that Commerce has the discretion to apply adverse BIA even when the requested information is controlled by an uncooperative unrelated company. *See e.g., Asociacion Colombiana de Exportadores de Flores v. United States*, 6 F.Supp.2d 865, 887–88, 22 CIT ——, ——, slip op. 98-33, at 44-49 (March 25, 1998)(upholding application of first-tier BIA affecting duty paid by importer of record unrelated to uncooperative flower producer); *see*

*also Transcom Inc. v. United States*, 5 F.Supp.2d 984, 990–91, 22 CIT ——, ——, slip op. 98-42, at 18–19 (April 7, 1998)(upholding Commerce's application of BIA to an individual party when information had been requested from unrelated exporters and exporters failed to respond).

While the "facts available" standard under the post-URAA statute curtails this hands-off approach, it does not change the outcome of this case. Plaintiff here does not claim that it was providing information to the best of its ability and that therefore Commerce erred in adopting adverse inferences. *See* 19 U.S.C. § 1677e(b). Nor does Plaintiff allege that Commerce imposed an unreasonable burden on interested parties where they were not able to submit the requested information. *See* 19 U.S.C. § 1677m(c)(1)(1994). Here, neither Plaintiff nor NKK claimed that they could not submit the information. NKK simply did not complete the questionnaire.

*tries of merchandise* covered by the determination." Def.'s Brief at 15 (citing 19 U.S.C. § 1675(a)(2)(C)) (emphasis in original). Therefore, Commerce claims the Court should defer to the Department's practice of calculating margins using all sales linked to entries made during the period of review. Def.'s Brief at 11.

Defendant–Intervenor U.S. Steel adds that this court has approved Commerce's interpretation regarding calculation of antidumping duties on all entries. *See* Mem. Def.-Intervenor Opp'n Mot. J. Agency R. at 13 ("U.S. Steel Brief") (citing e.g., *FAG Kugelfischer Georg Schafer v. United States,* 86 F.3d 1179, 1179, 1996 WL 267277 (Fed.Cir. 1996) (stating that 19 U.S.C. § 1675(a)(2) requires "Commerce in [an] administrative review to determine dumping margins and duties for entries during review period")).

While the statute mandates that Commerce use sales to calculate the antidumping margin, the statute is silent with respect to when those sales must occur. Section 1675 requires Commerce to "determine ... the normal value and export price ... of each entry, and ... the dumping margin for each such entry". 19 U.S.C. § 1675(a)(2)(A). The statute instructs Commerce to use sales in order to determine the export price needed to calculate the dumping margin. *See* 19 U.S.C. § 1677a(a) ("The term 'export price' means the price at which the subject merchandise is first sold...."). However, the statute does not limit Commerce to using sales within a specified period in determining the export price.

Therefore, because the statute is silent with respect to the universe of sales to be used in calculating dumping margins, the Court must defer to Commerce's interpretation of the statute as long as the interpretation is reasonable. *See Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1573 (Fed.Cir. 1994).

### III. Court Precedent

Plaintiff argues that Commerce's inclusion of sales made prior to the Order in its margin calculation is contrary to the precedent of this court. Pl.'s Brief at 12. More specifically, Plaintiff asserts that the holding in *General Elec. Co. v. United States,* 17 CIT 268 (1993), compels Commerce, to "exclude for margin calculation and duty assessment purposes sales of merchandise outside the period covered by an administrative review." Pl.'s Brief at 6.

Plaintiff misinterprets the holding of *General Electric.* The administrative proceeding under review in *General Electric,* unlike this case, involved an "enormous number of transactions" and "reviews were requested" for over sixty foreign producers and exporters. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 56 Fed.Reg. 31,692, 31,692 (Dep't Commerce 1991) (final results antidumping duty admin. rev.). In order to accommodate the enormous amount of data, Commerce examined sales during the POR rather than entries for margin calculation purposes. Commerce explained:

> Since units entered and units sold are almost identical in purchase price situations, we can collect a close approximation of the total dumping duty liability by calculating importer-specific per-unit amounts for sales during the period of review and applying those per-unit amounts to entries during the period.

*Id.* at 31,701.

As the *General Electric* court noted, Commerce concluded that the sales-based methodology in that case would not significantly distort the results. 17 CIT at 271. Because Commerce assessed duties on entries by examining sales during the POR, the *General Electric* court required Commerce to maintain consistency in its approach by calculating dumping margins using only sales within the POR. *Id.* In this case, Commerce did not face the same enormous transaction figures and did not utilize a sales-based approach. Rather, the Department requested that NKK report each "sale of merchandise *entered* for consumption during the POR." P.R. Doc. No. 8, at 58 (emphasis added). Therefore, the exclusion of sales outside the POR in *General Electric* is inapplicable to this case.

Furthermore, while the *General Electric* court held that sales outside the POR should be excluded for calculating margins, the

court noted that duties would still be assessed on entries made during the POR. 17 CIT at 272.

As a corollary to its first argument, Plaintiff argues that if Commerce cannot use sales outside the POR to calculate a dumping margin, then the Department cannot assess duties on the entries made during the review period because Commerce cannot measure those duties. Pl.'s Brief at 14. Plaintiff cites *Torrington Co. v. United States*, 82 F.3d 1039 (Fed.Cir.1996) (citations omitted), to support its position.

In *Torrington*, the court held that dumping duties could not be assessed on bearings which were imported into the United States and subsequently exported without any sale in the United States. *Id.* at 1047. Plaintiff notes the *Torrington* court reasoned that because no U.S. price could be determined for such shipments, no dumping margin could be calculated and, thus, no antidumping duties could be assessed. Pl.'s Brief at 14. Applying its interpretation of *General Electric* to the reasoning in *Torrington*, Plaintiff asserts that because all sales of the subject OCTG occurred prior to the POR, Commerce cannot calculate a dumping margin, and therefore, cannot assess antidumping duties upon the subject entries. *Id.*

Contrary to Plaintiff's assertion, the application of *General Electric* to *Torrington* is misplaced. As discussed above, *General Electric* does not apply to this case. Furthermore, *Torrington* does not support Plaintiff's position either. In *Torrington*, the merchandise entered during the review was "neither sold in the United States nor likely to be sold in the United States." 82 F.3d at 1047. Therefore, the U.S. price needed to calculate the dumping margin as required by section 1675(a)(2) did not exist. *See* 19 U.S.C. § 1675(a)(2). In contrast, in this case, the subject merchandise *was sold* in the United States. Accordingly, an export price (formerly U.S. price) necessary for calculating the dumping margin did exist.

Plaintiff also relies on *NSK Ltd. v. United States*, 115 F.3d 965 (Fed.Cir.1997), to buttress its readings of *General Electric* and *Torrington*. Pl.'s Brief at 15. The court in *NSK* held that free samples of antifriction bearings did not constitute "sales" and therefore, should not have been included in calculating U.S. price. 115 F.3d at 975. Plaintiff claims that the *NSK* court excluded the samples from the calculation of U.S. price because no sales took place. Plaintiff argues this case is similar to *NSK* because no sales took place here during the POR. Thus, Commerce had no sale upon which to calculate the dumping margin. Pl.'s Brief at 15. Plaintiff's reliance on *NSK* is misplaced as that case is inapposite.

The *NSK* court did not discuss whether Commerce should calculate and assess duties only upon sales within the POR. In *NSK* as in *Torrington*, the question presented was whether the transactions at issue constituted sales. In contrast, in this case, the issue presented does not concern whether sales existed, but rather whether those sales should be included in calculating a dumping margin.

In sum, the precedents cited by Plaintiff fail to demonstrate that Commerce's use of sales prior to the POR to assess margins on entries during the POR is unreasonable under existing law.

## IV. Administrative Practice

 Plaintiff further contends that Commerce's determination is inconsistent with past administrative practice. Pl.'s Brief at 12. Specifically, Plaintiff cites *Portable Electric Typewriters From Japan*, 56 Fed.Reg. 56,393 (Dep't Commerce 1991) (final results admin. review)("*Portable Electric*"), to support this argument. In *Portable Electric*, Commerce "review[ed] only those transactions with dates of sale falling within the period of review." Pl.'s Brief at 15–16.

Commerce responds the Department's usual practice in export price situations is to review and assess duties on entries within the POR, regardless of whether the sales occurred prior to the review period. Def.'s Brief at 20 (citing *High Tenacity Rayon Filament Yarn From Germany*, 61 Fed.Reg. 51,421, 51,422 (Dep't Commerce 1996) (final results admin. review)("High Tenacity")(including sale made prior to the POR in the determination because the sale was not reviewed in the previous administrative re-

view); *Ferrosilicon From Brazil*, 62 Fed. Reg. 43,504, 43,510 (Dep't Commerce 1997) (notice final results admin. review) (including sales made prior to the POR in margin calculation because merchandise was entered during the review period)); *see also* U.S. Steel Brief at 16–17 (citing *Silicon Metal From Argentina*, 58 Fed.Reg. 65,336, 65,344 (Dep't Commerce 1993) (final results admin. review) (including sales made prior to the POR in analysis because subject merchandise was entered during the POR and noting that whenever the data permits, the Department conducts a review based on entries of the subject merchandise)).

To further clarify the Department's entry-based approach in export price cases, Commerce differentiates export price situations from certain CEP situations where the Department adheres to a sales-based approach for margin calculation. Commerce argues that CEP situations differ from export price situations "because ... the delay between importation and resale to an unaffiliated customer means that merchandise entered during the review period often is different from the merchandise sold during that period." Def.'s Brief at 22; *see e.g.,* preamble to *Antidumping Duties; Countervailing Duties; Final Rule,* 62 Fed.Reg. 27,296, 27,314 (Dep't Commerce 1997). Therefore, "[b]ecause of the inability to tie entries to sales," Commerce uses only sales within the POR to calculate dumping duties. *Id.* However, Commerce explains, "[w]here a respondent *can* tie its entries to its sales, we potentially can trace each entry of subject merchandise made during a review period to the particular sale ... of that same merchandise ... and we conduct the review on that basis." *Id.*

Commerce acknowledges that in *Portable Electric* the Department used a sales-based approach. The Department claims, however, that *Portable Electric* "did not reflect an abandonment of [Commerce's] general practice" of examining entries. Def.'s Brief at 25. In fact, in *Portable Electric,* Commerce ex-

plained that "[t]he Department's reconsideration of this issue in this proceeding is not indicative of the adoption by the Department of a sales-based approach or the rejection of an entry-based approach with respect to purchase price sales." Def.'s Brief at 25–26 (citing *Portable Electric,* 56 Fed.Reg. at 56,-397).

In addition, Commerce stresses that the Department was not required to follow a sales-based approach because Commerce regulations allow for flexibility in calculating the dumping margin. *See* Def.'s Brief at 20 (citing 19 C.F.R. § 353.22(b) ("[A]n administrative review ... normally will cover, as appropriate ... entries, exports, or sales ... "")); *see also Silicon Metal From Brazil,* 61 Fed.Reg. 46,763, 46,765 (Dep't Commerce 1996) (final results admin. review) ("[T]he Department's regulations permit a review of either 'entries or sales' "").

The Court concludes that Commerce's approach is reasonable. First, Commerce has maintained a policy and practice of calculating and assessing duties on entries, regardless of when the sales took place.[7] *See Timken Co. v. United States,* 10 CIT 86, 103, 630 F.Supp. 1327, 1342 (1986) (noting that an agency's longstanding administrative practice adds weight to an agency's interpretation of a statute). In the cases cited by Commerce and U.S. Steel, Commerce used sales outside the POR to calculate dumping margins on entries within the POR. The Department explicitly states in the referenced cases that the inclusion of sales linked to entries during the POR comports with the Department's focus on entries. *See, e.g., Silicon Metal From Argentina,* 58 Fed.Reg. at 65,344 (noting that requesting companies to report all sales entered during the POR in purchase price situations "has been [the Department's] longstanding practice"); *High–Tenacity,* 61 Fed. Reg. at 51,422 (noting that Commerce "normally requires that duties be assessed on merchandise entering during a particular review period"); *Ferrosilicon From Brazil,* 62

---

7. The Court notes that none of the cases cited by Commerce and U.S. Steel indicate that the sales involved occurred prior to the issuance of the antidumping order. However, this fact has no bearing on the decision. Commerce focuses on entries made during the POR. Therefore, as the sales of the subject merchandise in this case can be linked to the entries made during the POR, the timing of the sales is apparently inconsequential.

Fed.Reg. at 43,510 ("It has been the Department's practice to calculate dumping margins for export price sales based on sales entered during the POR.").

Furthermore, the fact that Plaintiff can point to *Portable Electric,* an isolated case where Commerce reviewed only those sales occurring within the POR, does not discredit Commerce's entry-based approach. In *Portable Electric,* Commerce expressly stated that the review of sales rather than entries did not establish a general pattern.[8] *Portable Electric,* 56 Fed.Reg. at 56,397. The review of sales was "for purposes of this proceeding and specifically, the 1988–89 and 1989–90 review periods." *Id.*

In addition, the statute clearly mandates that Commerce assess antidumping duties on *entries* of merchandise covered by the determination. *See* 19 U.S.C. § 1675(a)(2)(C)(emphasis added). Because Commerce must assess duties upon all entries made after the issuance of an antidumping order, the entry-based approach ensures that entries covered by the determination do not escape duty assessment. As Commerce noted in *Silicon Metal From Argentina,* if the Department did not require that companies report all sales which entered the United States during the POR, Commerce would "never analyze these sales for assessment purposes ... therefore, whenever the data permit, we conduct a review based on entries of the subject merchandise." 58 Fed.Reg. at 65,344.

■ Moreover, Commerce's practice allows the Department to link entries during the POR to relevant sales in all possible cases. Such a practice is reasonable because it results in a more accurate measure of dumping margins. Otherwise, the margins could be distorted by including irrelevant sales that occur within the POR.[9] *See, e.g., Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir.1990) (noting the importance of ensuring accurate antidumping margins); *Federal–Mogul Corp. v. United States,* 18 CIT 1168, 1172, 872 F.Supp. 1011, 1014 (1994) (emphasizing that "fair and accurate determinations are fundamental to the proper administration of our dumping laws").

Finally, as Commerce explained in *High Tenacity,* maintaining an entry-based methodology, regardless of whether the sales occurred prior to the POR, is reasonable because it promotes the objective of offering clarity and predictability to the antidumping law. *See* 61 Fed.Reg. at 51,422.

In this case, there is no indication that the Plaintiff's situation deviated from other situations where Commerce has used sales outside the POR to calculate and assess duties on entries made within the POR. Therefore, Commerce's decision to calculate and assess duties based on entries in this case is reasonable and in accordance with law.[10]

### V. Absurd Results

■ Plaintiff further contends that Commerce's focus on entries, without regard to date of sale, would lead to "absurd" results. Pl.'s Brief at 16. Plaintiff claims such a practice permits the assessment of antidumping duties upon goods which have been in a foreign trade zone "5, 10, or 20 years prior to the issuance of an antidumping order." Pl.'s

---

8. In *Portable Electric,* the party requesting the review pointed out that Commerce had limited its review to sales during the POR in the first review and thereafter had consistently followed the sales-based approach. 56 Fed.Reg. at 56,-396. Therefore, retaining the sales-based approach in *Portable Electric* allowed Commerce to handle the margin calculation of Nakajima's sales in a consistent manner. In contrast, this case deals with a first administrative review. Therefore, Commerce was not constrained to utilize a sales-based approach to remain consistent.

9. In certain situations such as CEP situations where Commerce cannot tie entries to future sales, or when the Department cannot ascertain entry dates, Commerce cannot calculate margins based on sales linked to entries. Therefore,

Commerce may resort to the less accurate approach of calculating margins based on possibly unlinked sales during the POR. *See Ad Hoc Comm. of So. Calif. Producers of Gray Portland Cement v. United States,* 19 CIT 1398, 1407, 914 F.Supp. 535, 544 (1995).

10. Plaintiff also argues that because Commerce cannot use sales outside the POR to calculate antidumping duties, Commerce must establish the date of sale as a threshold issue in determining antidumping duties. Pl.'s Brief at 8–9. However, as the Court has upheld Commerce's policy of assessing duties on entries during the POR, regardless of when the date of sale occurred, Commerce did not need to make a determination as to the date of sale.

Brief at 17. According to Plaintiff, this undermines the purpose of an FTZ by "extend[ing] the application of the antidumping duty determinations retroactively in an indefinite manner, thus, reaching sales of merchandise which have never been examined and which may have been sold under completely different market conditions than those which led to the issuance of the antidumping duty order." *Id.*

Commerce responds that the result in this case is not absurd because the antidumping statute provides for assessment of duties upon all entries regardless of whether they have been in an FTZ or elsewhere. Def.'s Brief at 27. U.S. Steel adds that failing to assess duties upon goods entered from an FTZ would undermine the antidumping laws because it would allow foreign producers to stockpile merchandise in the FTZ as a hedge against the subsequent imposition of an antidumping order. U.S. Steel Brief at 26.

First, merchandise admitted into a foreign trade zone is exempt from an antidumping order or administrative review while it is in the zone; however, the exemption expires upon entry into the U.S. customs territory. *Timken Co. v. United States,* 18 CIT 897, 904, 865 F.Supp. 850, 856 (1994). Foreign trade zone regulations mandate that FTZs "shall not be used to circumvent antidumping and countervailing duty actions." 15 C.F.R. § 400.33(b)(1). Accordingly, Commerce cannot make an exception for goods subject to an antidumping duty order once they have entered the customs territory of the United States, but is required to include the merchandise in an administrative review. *Timken Co. v. United States,* 18 CIT 942, 950, 865 F.Supp. 881, 888 (1994).

Second, Plaintiff's fear of a retroactive extension of the antidumping duty laws to non-contemporaneous sales is baseless. Section 1675(a)(2)(A) requires Commerce to determine the dumping margin by comparing the normal value and the export price. 19 U.S.C. § 1675(a)(2)(A). "The normal value of the subject merchandise shall be the price ... *at a time reasonably corresponding to the time of the sale* used to determine the export price ... and normal value." 19 U.S.C. § 1677b (a)(1)(A) (emphasis added). Because the statute dictates that the calculation of normal value corresponds to the time of the sale, the dumping margin will always be contemporaneous with the home market conditions at the time of sale, thus avoiding assessment of any "retroactive" dumping margin. Therefore, the assessment of duties upon entries that previously have been in an FTZ or elsewhere does not lead to absurd results.

### Conclusion

For the reasons stated above, Commerce's determination in *Oil Country Tubular Goods From Japan,* 62 Fed.Reg. 48,594 (Dep't Commerce 1997)(final results admin. review) is affirmed in all respects.

### ORDER

This case having been duly submitted for decision, and this Court, after due deliberation, having rendered a decision herein; now in conformity with said decision, it is hereby

ORDERED that Plaintiff's Motion for Judgment Upon the Agency Record challenging aspects of the U.S. Department of Commerce's final results of the administrative review in *Oil Country Tubular Goods From Japan,* 62 Fed.Reg. 48,594 (Dep't Commerce 1997)(final results admin. review) is denied; and it is further

ORDERED that Commerce's determination is sustained in all respects.